IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Joy Chapin,

      Plaintiff,

      v.                      Case No. 2:05-cv-734

Nationwide Mutual
Insurance Co.,

      Defendant.

<u>OPINION AND ORDER</u>

     This is an employment discrimination action filed by plaintiff Joy Chapin against her former employer, Nationwide Mutual Insurance Co. ("Nationwide"). In Count One of her amended complaint, plaintiff alleged that Nationwide discriminated against her on the basis of her age in regard to the terms and conditions of her employment, and unlawfully terminated her employment in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 <u>et</u> <u>seq</u>. In Count Two, plaintiff alleged that Nationwide retaliated against her in violation of the ADEA, 29 U.S.C. §623(d) for engaging in activity protected under the ADEA. In Count Three, plaintiff alleged that Nationwide's actions violated the discrimination and retaliation provisions of Ohio Rev. Code §4112.02 and the public policy of Ohio against age discrimination and retaliation. Count Four, a claim for breach of contract, was dismissed with prejudice by stipulation of the parties on October 3, 2006.

     This matter is before the court on Nationwide's motion for summary judgment. The procedure for granting summary judgment is found in Fed. R. Civ. P. 56(c), which provides:

     The judgment sought shall be rendered forthwith if the

> pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).

The Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex and Matsushita effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. Street v. J. C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). The court in Street identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. Id. at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Id. (quoting Liberty

2

Lobby, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. Id. It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" Id. (quoting Matsushita, 475 U.S. at 586). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

I. Facts of the Case

Plaintiff's date of birth is January 25, 1950. At the time of the events in this case, she was fifty-three to fifty-four years old. Plaintiff commenced her employment with Nationwide on November 22, 1999, at the age of forty-nine. Plaintiff's position was that of senior recruiter. Her starting salary was $55,000, and in 2001, she received a merit raise of $5,000. Recruiting and Staffing is a separate unit within Nationwide's Human Resources Department. The duties of the senior recruiter position included recruiting activities, interviewing and evaluating applicants, and presenting candidates for employment to the various hiring managers serviced by the recruiter. The positions under senior recruiter included that of recruiter and recruiting coordinator. The recruiting coordinators occupied a support position. Their duties included computer entry work, typing offer letters, sending disposition letters, making sure drug and background checks were completed, and copying resumes and letters for the hiring packages given to hiring managers in the various departments serviced by the

3

recruiters.

From November 1999 to February 2003, plaintiff provided recruiting services to defendant's Property and Casualty Information Technology ("IT") Systems. During a portion of this time period, she reported to Rocky Parker, the director of Recruiting and Staffing. In February of 2003, plaintiff was reassigned to provide recruiting services to the IT staff within Nationwide Financial Services ("NFS"). Christopher Anderson, the new director of NFS Recruiting and Staffing, became plaintiff's supervisor. Anderson in turn reported to Human Resources Officer of Recruiting and Staffing Brent McMenemy.

In August or September of 2003, Anderson asked plaintiff to provide recruiting and staffing services to Nationwide Retirement Solutions ("NRS"), a division of NFS. This request was prompted by the fact that the person occupying that position, Cyndi Williams, was accepting a temporary assignment as an executive on loan to the United Way. Plaintiff was approached about the position because she was already assigned to NFS, and IT recruitment was down. Plaintiff agreed to accept the position. At the time, it was unknown whether plaintiff's assignment to that position would be temporary or permanent, since it was not established whether Williams would return to that position. When Williams obtained another position within the Human Resources Department on her return, plaintiff's assignment to NRS became permanent. For a brief period, plaintiff performed recruiting services for her former IT position and for NRS, but was later assigned solely to NRS. Recruiting Coordinator Mike Giasi was assigned to assist plaintiff. Plaintiff's new office was located in Nationwide's

Parkwood office.  This office was also occupied by the NFS Human Resources Department, a separate unit headed by then Director Cynthia Henricksen.  Anderson's office was located in a Nationwide office in downtown Columbus, Ohio.

As a recruiter for NRS, plaintiff's "customers" or the persons she served were the hiring managers within NRS, job applicants, and the NFS Human Resources Department.  Since they shared the same customer base, NFS Recruiting and Staffing maintained a strong working relationship with the NFS Human Resources Department.  If an issue regarding a recruiter's performance was the subject of a complaint to the NFS Human Resources Department, Henrickson would bring it to the attention of the recruiter or NFS Recruiting and Staffing management.  However, Henrickson had no supervisory authority over the recruiters.  Due to the close working relationship between the NFS recruiting staff and the NFS Human Resources Department, inquiries regarding personnel issues relating to employees in those units were usually directed to the Corporate Human Resources Department rather than to Henrickson.

Prior to her acceptance of the NRS assignment, plaintiff's job performance and performance evaluations were satisfactory.  Soon after plaintiff assumed her new duties, complaints were made by NRS managers to Henrickson regarding plaintiff's performance, and Henrickson forwarded these complaints to Anderson.  The complaints concerned plaintiff's lack of service to her customers, such as delays in responding to e-mails, returning phone calls or providing follow-up, and the appearance of inaccuracies in the information in offer letters regarding the names of successful candidates, the position's start date and geographical location, and the terms of

5

compensation for the position. For example, in an e-mail dated October 10, 2003, Hiring Manager Margaret Osborne complained about the lack of service she received in regard to her open positions, noting that it took over a week to extend an offer to one candidate, and that no follow-up had been received concerning that position. In response to this e-mail, plaintiff agreed that the level of service was not up to the standard she would like to provide. Anderson spoke with plaintiff about these complaints, and plaintiff admitted that errors had occurred.

When errors in plaintiff's performance continued, Anderson included his concerns in a written performance coaching document, the first step in Nationwide's disciplinary process. He met with plaintiff on November 26, 2003, and gave her a copy of the document. This document indicates that the topics of discussion during the coaching included relevant customer relationships and the expectations for a senior recruiter. Plaintiff was urged to communicate her schedule to the Parkwood office, to focus on her customer base, and to be more consistent and timely in her responses to customers. Anderson contacted plaintiff in mid-December of 2003 to further discuss concerns with her performance such as delays in the return of phone calls and e-mails, lack of follow through, and basic recruiting mistakes. Plaintiff maintained that the errors were due in part to the fact that the form letters she was accustomed to using in her previous assignments were not used by the hiring managers at NRS, and that each manager required a different letter. Plaintiff spent time in November and December determining what the managers required for their letters, and created new forms. She also attributed some of

the errors to Mike Giasi.

In February of 2004, Anderson met with plaintiff, Giasi, and Giasi's supervisor, Staci Gardner.  Anderson held this meeting following feedback from plaintiff and Giasi, which included concerns about the NRS processes and lack of teamwork.  Anderson viewed the meeting as a positive one, and believed plaintiff left the meeting with a clear understanding of the processes and her role.  However, mistakes continued to occur.

On March 1, 2004, Anderson and Linda Hatfield, who was also a director in NFS Recruiting and Staffing, met with plaintiff to discuss her performance evaluation for the calendar year 2003, which spanned a period before and after plaintiff's assignment to NRS.  Plaintiff received a rating of "achieves criteria" on all of the objectives in the evaluation, the other ratings in the evaluation system being "does not meet criteria" and "exceeds criteria."  However, it was noted in the evaluation that there were areas of concern with plaintiff's "time to fill" statistics; that, although plaintiff received some positive feedback from customers, her service to customers had been inconsistent; that out of every ten actions, plaintiff performed well on six or seven, but her performance dropped substantially on the remaining three or four items; that plaintiff needed to act more accountably and accept responsibility in communicating with associates and taking charge of the recruitment process within NRS; and that plaintiff needed to see the customer perspective in certain situations.

In the first quarter of 2004, plaintiff continued to have performance problems.  Henrickson and Anderson received numerous complaints about inaccuracies in offer letters being sent by

plaintiff. For example, on March 2, 2004, Henrickson forwarded to Anderson an e-mail which she had received from Compensation Manager Susan Irwin. In this e-mail, Irwin complained about the many errors in the hiring letters being sent out by plaintiff, including major errors concerning the amount of compensation. Irwin noted one such letter in which plaintiff incorrectly informed a new hire that he would receive a ninety-day new hire bonus, when in fact he was not eligible for a bonus, and that his annual targeted incentive was $11,000, when in fact it was $7,100.

Anderson also received a complaint from Brian McCleave, a vice president of business development. McCleave had e-mailed plaintiff asking her to disposition five applicants from a group of applicants he was still considering, but due to plaintiff's failure to respond, he had to resubmit his request twice. On March 2, 2004, Staci Gardner expressed her concerns to Anderson about plaintiff's lack of response to a candidate seeking a job at NFS who asked plaintiff for the hiring manager's name for open positions. Plaintiff eventually responded by stating that she would present the associate's resume but that she was swamped with work and that it was time consuming to give him the managers' names. Anderson received other complaints and feedback from hiring managers, applicants, Henrickson, and members of Henrickson's staff.

Anderson consulted with McMenemy and Susan Chieffo, a specialist with the Corporate Human Resources Department. Anderson decided to place plaintiff on a thirty-day performance improvement plan, that being the next step in the Nationwide disciplinary program. Chieffo assisted in drafting the plan. On March 11,

2004, Anderson and McMenemy met with plaintiff to present the plan and to discuss the performance objectives described in the plan. Those objectives focused on: (1) plaintiff's performance deficiencies, such as her lack of promptness in getting back to customers, mistakes in offer letters, and lack of professionalism in communicating with customers; (2) plaintiff's need to become more customer focused and treat managers and associates as her customers; and (3) plaintiff's need to accept responsibility for her mistakes and problems rather than trying to shift the blame to others. The performance expectations specified in the plan included: returning phone calls within twenty-four hours; making offers within twenty-four hours of receiving that information from the hiring managers; attaining one hundred percent accuracy in offer letters; using a professional and respectful tone in communicating with customers; not claiming to be too busy to assist someone; and taking responsibility for actions. During the meeting, plaintiff acknowledged that there were issues with her performance. However, Anderson was troubled by the fact that plaintiff attempted to avoid accepting responsibility for those errors by blaming others and making excuses.

The performance improvement plan was scheduled to run from March 11, 2004, to April 15, 2004. Although plaintiff continued to have performance problems during this period, Anderson removed plaintiff from performance improvement status on April 22, 2004, and checked the box on the form which stated that plaintiff "successfully completed" the performance improvement plan. Anderson indicated that he reached this decision because plaintiff had shown some improvement during the work improvement period.

Anderson also knew that a second thirty-day plan or an extension of the plan would render plaintiff subject to termination if she failed to meet the plan objectives, and he was hopeful that plaintiff could correct her performance deficiencies and avoid further discipline. The plan language advised plaintiff that she would be expected to maintain a satisfactory level of performance after the work improvement plan ended, and that the failure to satisfy the requirements of the plan and maintain satisfactory performance after completion of the plan could result in the termination of her employment.

After the termination of plaintiff's performance improvement plan, Anderson received additional information from Henrickson and her staff, hiring managers, and other Recruiting and Staffing personnel concerning plaintiff's performance. On April 28, 2004, Anderson learned that plaintiff had sent what Anderson considered to be an unprofessional e-mail to Dan Goodall, a senior business analyst with NRS, concerning her difficulties in posting a position on POST, the electronic job database. In this e-mail, plaintiff stated that problems with the POST system would be "a direct hit at me and my performance" and noted that Goodall had not had "the opportunity to gain the experience of being a recruiter to understand the urgency of some of our requests." Anderson Aff., Ex. A-9.

In late April or early May of 2004, McMenemy reviewed the results of a survey completed as part of an ongoing customer feedback process by hiring managers who worked with plaintiff in meeting their recruiting and staffing needs. He was concerned with plaintiff's scores on this survey. Forty-three percent of managers

10

surveyed indicated that they were not satisfied with the overall level of customer service provided by plaintiff, and twenty-nine percent were neutral, a total of seventy-two percent. Twenty-nine percent disagreed with the statement that plaintiff was a valued partner in the recruiting process, and twenty-nine percent were neutral, a total of fifty-eight percent. Forty-three percent of the managers surveyed disagreed that plaintiff did a good job of helping put the right people into the right positions within their areas, and twenty-nine percent were neutral, a total of seventy-two percent. Twenty-nine percent of the managers indicated that they were not satisfied with the average amount of time it takes to fill positions, and forty-three percent stated that they were neutral. Fifty percent of the managers answered that they disagreed with the statement that their experience with plaintiff captured the Nationwide brand tenants of being genuine, reliable and energetic, and thirty-three percent gave a neutral response. Anderson and McMenemy were concerned about the impact that plaintiff's performance could be having on the relationship between Recruiting and Staffing and its customers.

Anderson concluded that plaintiff was not performing at a satisfactory level, and that her performance was deteriorating. He consulted with Chieffo about offering plaintiff two options: (1) placing plaintiff on a second performance improvement program, which plaintiff would have to complete successfully in order to avoid termination; or (2) giving plaintiff thirty days to search for other employment inside or outside Nationwide, with the understanding that if she did not find other employment within Nationwide within the thirty-day period, her employment would be

terminated.

On May 26, 2004, Anderson and Hatfield met with plaintiff to offer her these options.  On May 27, 2004, plaintiff e-mailed Anderson to ask about what kinds of expectations would be involved if she opted for the performance improvement program.  Anderson sent plaintiff a copy of the proposed plan, which repeated the concerns and expectations listed in the first plan, noted the unacceptable scores on the hiring manager's survey and continuing customer complaints concerning the recruiting relationship with NRS, and stated, "There can be no further complaints from our customers."

On May 27, 2004, Henrickson forwarded to Anderson additional examples of  plaintiff's poor performance.  Gari Aber, a hiring manager, complained on that date about plaintiff's delay in forwarding the information from interviews which were completed two weeks earlier and plaintiff's failure to return her phone calls. On May 26, 2004, Louie Watson, a regional vice president, complained about a position which had been open for the past eight weeks, with no applicants being referred by plaintiff.  Watson requested that someone other than plaintiff be assigned to help fill the position.  Henrickson also relayed the complaint of Susan Irwin, one of the NFS Human Resources staff members, that plaintiff had been asking her to review each offer letter, and that as a result Irwin was having trouble completing her own tasks. Henrickson indicated that it was her belief that the recruiter should be the expert on these letters and should not need this level of oversight.

On June 1, 2004, plaintiff informed Anderson and McMenemy that

12

she had elected to take thirty days to find another job.  At that point, plaintiff was not required to perform any of the duties of her recruiter job, and was allowed paid leave to search for other employment during that period, which ran from June 1, 2004, through June 30, 2004.  Plaintiff did not secure a position with Nationwide during that period, resulting in the termination of her employment. Plaintiff was not due to vest in Nationwide's retirement program until October 22, 2004.  However, she subsequently reached an agreement with Nationwide which allowed her to go on unpaid leave until she vested and to receive her retirement benefits.

At some point after the end of her first performance improvement plan, plaintiff talked to Barbara Scott in the Corporate Human Resources Department and complained about age being a factor in promotion in Recruiting and Staffing.  On June 29, 2004, plaintiff also complained to LeRoy Johnston, Nationwide general counsel, about age discrimination and retaliation.  At some point after June 1, 2004, Anderson was advised by Annie Howard and Don Adams, other recruiters in plaintiff's area, that plaintiff had approached them about filing an age discrimination complaint against Nationwide.  Howard and Adams indicated that they disagreed with plaintiff's allegations.  Anderson reported this information to McMenemy and Chieffo.  Chieffo later informed Anderson that Nationwide would be conducting an internal investigation.

An internal investigation was conducted by Frank Maroni, a human resources consultant in the Office of Associate Relations. In his report, Maroni states that he was unable to uncover any objective evidence to support plaintiff's claim of age bias in regard to promotion.

On December 13, 2004, plaintiff filed a charge of age discrimination and retaliation with the Equal Employment Opportunity Commission. On May 3, 2005, the Commission issued a notice of dismissal and right to sue.

## II. Age Discrimination Claims

Plaintiff has asserted claims of age discrimination in violation of the ADEA and Ohio Rev. Code §4112.02. Federal law standards also apply to age discrimination claims under Ohio law. See Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1115 (6th Cir. 2001); Coryell v. Bank One Trust Co., N.A., 101 Ohio St.3d 175, 177-180, 803 N.E.2d 781 (2004). A plaintiff may establish age discrimination either by direct evidence of discrimination or by establishing a prima facie case of age discrimination under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Minadeo v. ICI Paints, 398 F.3d 751, 763 (6th Cir. 2005); Byrnes v. LCI Communication Holdings Co., 77 Ohio St.3d 125, 128, 672 N.E.2d 145 (1996). No direct evidence of age discrimination has been produced in this case. Therefore, the analysis in McDonnell Douglas applies.

To establish a prima facie case of age discrimination in termination, plaintiff must show that: (1) she was a member of the protected class; (2) she was discharged; (3) she was qualified for the position; and (4) she was replaced by a substantially younger person, or similarly situated non-protected or substantially younger employees were treated more favorably. Minadeo, 398 F.3d at 764; Coomer v. Bethesda Hosp., Inc., 370 F.3d 499, 511 (6th Cir. 2004); Grosjean v. First Energy Corp., 349 F.3d 332, 335 (6th Cir.

2003); <u>Coryell</u>, 101 Ohio St.3d at 180.

To establish a prima facie case of disparate treatment, plaintiff must show that: (1) she was a member of the protected class; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) similarly-situated non-protected or substantially younger employees were treated more favorably. <u>Coomer</u>, 370 F.3d at 511; <u>Kohmescher v. Kroger Co.</u>, 61 Ohio St.3d 501, syllabus, 575 N.E.2d 439 (1991); <u>Dunnigan v. City of Lorain</u>, No. 02CA008010 (9th Dist. unreported), 2002 WL 31313216 at *2 (Ohio App. Oct. 16, 2002).

To be similarly situated, exact correlation is not required, but the plaintiff and the employees with whom the plaintiff seeks to compare herself must be similarly situated in all relevant aspects at the time of the adverse job action. <u>Clayton v. Meijer, Inc.</u>, 281 F.3d 605, 611 (6th Cir. 2002); <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998); <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577,583 (6th Cir. 1992).  The other employees must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them. <u>Ercegovich</u>, 154 F.3d at 352; <u>Kroh v. Continental Gen. Tire, Inc.</u>, 92 Ohio St.3d 30, 31, 748 N.E.2d 36 (2001).

In order to make a prima facie case based on failure to promote, plaintiff must show that: (1) she is a member of the protected class; (2) she applied for, and did not receive, a job; (3) that she was qualified for the job; and (4) that a similarly-situated non-protected or substantially younger person received the

job.  See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 313 (1996)(modifying fourth prong of test to require that person who received the job was a "substantially younger" individual); Anthony v. BTR Automotive Sealing Systems, Inc., 339 F.3d 506, 515 (6th Cir. 2003); Coryell, 101 Ohio St.3d at 180.  In order to satisfy the fourth prong, plaintiff must show that she and the person who was promoted had similar qualifications.  White v. Columbus Metropolitan Housing Auth., 429 F.3d 232, 241-42 (6th Cir. 2005).

If plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the decision.  Grosjean, 349 F.3d at 335;  After defendant has met this burden, the plaintiff must produce sufficient evidence of pretext to permit a jury to reasonably reject the employer's explanation.  Grosjean, 349 F.3d at 335 (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994)).  Plaintiff can refute the legitimate, nondiscriminatory reason offered by the employer by showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct.  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003).  The ultimate burden of proof that the defendant intentionally discriminated against the plaintiff remains at all times on the plaintiff.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).

In regard to plaintiff's claim of discrimination in discipline and termination, it is not disputed that plaintiff is a member of

16

a protected class. It is also not disputed that she was subjected to adverse job actions.

In regard to the third element, Nationwide argues that plaintiff has failed to satisfy the third element of the prima facie case (that she was qualified for the position) because plaintiff was not performing up to Nationwide's expectations. However, in analyzing the third prong, a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action. Wexler, 317 F.3d at 574. Rather, plaintiff may meet this prong by presenting credible evidence that her qualifications are at least equivalent to the minimum objective criteria required for employment in her position. Id. at 576. Plaintiff was initially hired for the position of senior recruiter, and at the time of the termination of her employment, plaintiff had held that position for almost five years. There is sufficient evidence that plaintiff at least met the minimum objective criteria required for employment in that position, so as to satisfy the third prong.

In regard to the fourth prong, there is no evidence that a substantially younger person was assigned to plaintiff's position upon her termination. Likewise, there is no evidence that any similarly-situated, substantially younger person was treated more favorably in matters of discipline leading to termination. Anderson stated that no other recruiter under his direct report had performance issues comparable to those displayed by plaintiff, and that plaintiff was the only recruiter he had placed on performance coaching or a performance improvement plan due to poor performance. Anderson Aff., ¶ 38.

17

Plaintiff claims in general that Beth Freiling and Cyndi Williams, her predecessors in the NRS position, were similarly situated and were transferred rather than being placed on a performance improvement plan. However, plaintiff points to no specific evidence that Freiling or Williams had similar performance problems, or that they were otherwise similarly situated to plaintiff. Plaintiff's generalizations, conclusory statements, and her own subjective beliefs are insufficient to support a finding of discrimination. <u>Hartsel v. Keys</u>, 87 F.3d 795, 801-02 (6th Cir. 1996).

There is evidence that Freiling and Williams did not have similar performance problems. Anderson testified that he received some complaints about other recruiters, such as Beth Freiling, but they were "one-off" situations, not with the consistency of feedback he was getting about plaintiff's performance. Anderson Dep., pp. 52, 54. The evidence also shows that Freiling and Williams were not transferred due to performance problems or any other difficulties they were having being located in Henrickson's office. Freiling was asked to help the Human Resources staff with generalist duties which she had no interest in performing, so she took another recruiting job. Henrickson Dep., p. 62. Williams, who did have an interest in performing generalist duties, replaced Freiling, and later left to be an executive on loan at the United Way, at which time plaintiff was assigned to her position. Henrickson Dep., p. 61, 63. Plaintiff has produced no evidence that Freiling, Williams, or any other substantially younger employee in a comparable position had performance issues similar to plaintiff's but was not given the alternative between a performance

18

placement plan or termination.

Plaintiff also contends that she was treated less favorably when she was assigned to the NRS position, which, according to plaintiff, was notorious for problems and tensions among management. She summarily claims that Freiling and Williams experienced problems in that position and were transferred out, while she was not. However, as indicated above, the evidence shows that Freiling and Williams left the position for reasons other than performance problems. Plaintiff also acknowledged that she voluntarily accepted the position. She stated she might not have done so if she had realized that the position would become permanent. However, there is no evidence that Anderson said anything to mislead plaintiff in asking her to take the NFS position, since, at the time, he did not know whether Williams would be returning after her term with United Way.

There is no evidence that plaintiff requested a transfer to another senior recruiter position during this period, or that any such position was available during that time. Plaintiff did request to transfer out of the Parkwood office location in late 2003. Anderson was supportive of this request and stated that if plaintiff wanted to move to an office in one of Nationwide's other Dublin locations, there was sufficient space in the other buildings. Anderson Dep., pp. 49-50. He could not recall why the move did not take place. Plaintiff has offered no evidence that her request to move to another office was ultimately denied.

Plaintiff also claims that during her first performance improvement plan, Anderson did not meet with her on a weekly basis, as indicated in the plan, intimating that he did not follow through

to help her successfully complete the plan.  Anderson acknowledged
that while he met with plaintiff during the plan, he did not do so
on a weekly basis, since they worked in difference locations.
Anderson Dep., p. 56.  However, he stated that he did speak with
plaintiff verbally by telephone on an ongoing basis, and that as
situations arose, he would coach her on how to succeed.  Anderson
Dep., p. 55.

Plaintiff also contends that Anderson offered more assistance
in general to other younger staff members.  She stated that
Anderson told her that she was a senior recruiter, and that she
should be able to solve the problems, and that is not the approach
he took with younger staff.  Plaintiff's Dep., p. 112.  However, as
noted in Maroni's report of his investigation, it was the position
of Recruiting and Staffing management that senior recruiters were
expected to fulfill all clients' staffing needs without management
assistance.  Plaintiff has offered no evidence that the younger
staff members who received more assistance were also senior
recruiters.  There is no evidence any younger employee occupying
the position of senior recruiter was offered more assistance by
Anderson in solving problems than he provided to plaintiff.

Plaintiff has not offered evidence sufficient to raise a
genuine issue of fact in regard to the fourth prong of her claim of
disparate treatment in discipline and termination.  However, even
assuming that plaintiff has established a prima facie case,
Nationwide has offered legitimate, nondiscriminatory reasons for
plaintiff's discipline and termination.

Nationwide has produced documentary evidence in the form of
numerous e-mails complaining about problems with plaintiff's job

performance.  The record also includes the deposition testimony and affidavits of Anderson and Henrickson concerning the complaints they received about plaintiff's performance from hiring managers, applicants, and other Human Resources staff.  In addition, Nationwide has presented a survey of hiring managers which reflected a high percentage of dissatisfaction with aspects of plaintiff's performance.  Anderson and McMenemy stated in their affidavits that they did not know plaintiff's age, and that the decisions to do a performance coaching with plaintiff, to place plaintiff on a performance improvement plan, and to give her the choice between a second plan and a thirty-day period to look for a new position were motivated by her performance issues.

Plaintiff contends that these reasons were a pretext for age discrimination.  She notes her annual evaluation for 2003, in which she received ratings of "achieves criteria."  However, this evaluation encompassed the entire year, including the period predating plaintiff's assignment to NRS, when the problems in her performance first surfaced.  The evaluation also refers to some of the issues with plaintiff's performance which arose toward the end of the year.  The fact that plaintiff achieved higher evaluation scores from one supervisor at some previous time in her employment does not establish that she was qualified to receive a higher score at a later time, or that she was performing to the satisfaction of another supervisor during another evaluation period.  Peters v. Lincoln Elec. Co., 285 F.3d 456, 474 (6th Cir. 2002).

Plaintiff also relies on the fact that Anderson completed the performance improvement plan form by checking the box indicating that she had successfully completed the plan.  However, Anderson

21

explained in his affidavit and deposition why he decided to remove plaintiff from the plan. He stated he did so because he knew that if he continued plaintiff on the plan for another thirty days and she did not successfully complete the plan, her employment could be terminated, and because plaintiff had shown some improvement during that period and he was hopeful that plaintiff could further correct her performance deficiencies and avoid termination. Anderson Aff., ¶ 28. Further, the terms of the plan clearly stated that the successful completion of the plan would not prevent termination in the event that future performance problems occurred. Thus, the fact that Anderson reported that plaintiff had successfully completed the plan does not establish that his later reasons for offering plaintiff a choice between a second performance improvement plan and a thirty-day job search were a pretext for discrimination.

Plaintiff also argues that the evidence is insufficient to show that she had any performance problems after the completion of her first performance improvement plan. She attacks the survey on the grounds that it is not dated. However, Anderson stated in his affidavit that he received the survey after April 22, 2004. Anderson Aff., ¶ 31. McMenemy stated that he believed that the survey was done monthly, and that he received it in late April or early May of 2004. McMenemy Dep., p. 117; McMenemy Aff., ¶14. In light of this evidence, it would be reasonable for a jury to conclude that the survey was completed within a short time of its receipt by McMenemy. At the very least, it was new information which Anderson and McMenemy had not seen or considered previously.

Anderson indicated that, while the survey was one reason for

the decision to impose a second performance improvement plan, it was not significant or determinative. He noted other evidence of performance issues which came to his attention after the termination of plaintiff's performance improvement plan. These instances included the April 28, 2004, report of an unprofessional e-mail sent by plaintiff to Dan Goodall; a complaint by Gari Aber on May 27, 2004, about plaintiff's delay in forwarding the information from interviews which were completed two weeks earlier and plaintiff's failure to return her phone calls; a complaint on May 26, 2004, from Louie Watson, a regional vice president, about a position which had been open for the past eight weeks, with no applicants being referred by plaintiff; and a complaint by Susan Irwin that plaintiff had been asking her to review each offer letter. Anderson also testified concerning a verbal complaint he received concerning the delay in filling certain positions which, if left vacant over a certain period of time, would expose Nationwide to fines based on its contractual obligations. Anderson Dep., pp. 70-71. Plaintiff's own subjective belief concerning the quality of her work during that period is not sufficient to create a genuine issue regarding the honesty of her supervisor's assessment of her performance. Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1114 (7th Cir. 1998).

Plaintiff also notes the language "vested in 5 months" written on a copy of an e-mail submitted as Exhibit 2 to Henrickson's deposition. Plaintiff alleges that this was written by Anderson, and that it demonstrates that his proffered reasons were a pretext for age discrimination. However, Anderson was never asked in his deposition to identify this writing. Susan Chieffo stated in her

deposition that she did not know who wrote the note.  Chieffo Dep.,
p. 71.   She also stated that she did write the note "October 22
totally vested" on Exhibit 3, and that this information was not
something she would have shared with Anderson, but rather would
have been information for the Human Relations file.  Chieffo Dep.,
p. 46.   Chieffo further stated that plaintiff would have given the
information concerning vesting to Barb Scott of the Corporate Human
Relations Department, and she would have received the information
from Scott.  Chieffo Dep., pp. 48-50.  There is no evidence linking
these notes to Anderson, nor is there any evidence that Anderson
would have any role or input as to whether plaintiff received
retirement benefits.   There is also no evidence to support an
inference that Anderson terminated plaintiff to prevent her from
receiving retirement benefits, particularly since plaintiff did in
fact receive retirement benefits.

Plaintiff has failed to produce evidence sufficient to raise
a genuine issue of material fact on the question of pretext.  She
has submitted no evidence that the complaints about her work
performance were false or fabricated.   She admitted in her
deposition that there were problems with the offer letters sent to
candidates, and that she was not providing the hiring managers with
the level of service she would like them to receive.  For example,
when asked about the e-mail from Margaret Osborne, plaintiff agreed
that Osborne did not have the level of service that plaintiff would
have liked to provide.  Plaintiff's Dep., p. 102.  Plaintiff agreed
that the mistakes in the offer letter were significant issues and
that Osborne did not get the attention that she should have.
Plaintiff's Dep., p. 103.  She stated that she agreed that mistakes

were made in the letters, and that she accepted responsibility for those mistakes. Plaintiff's Dep., pp. 113, 117, 120. She agreed that subsequent to the creation of new form letters, mistakes were made regarding start dates, bonuses and assignments, and that she was responsible for looking at the letters to make sure they were correct. Plaintiff's Dep., p. 122. She acknowledged that she did not start reviewing the letters with Mike Giasi until May of 2004. Plaintiff's Dep., p. 123. She stated, "I'm not going to make any excuses for the mistakes. There are-there were tons of mistakes in there, and I didn't like any of them." Plaintiff's Dep., p. 128.

Plaintiff has produced no evidence from which a jury could reasonably find that the reasons given for the performance coaching and performance improvement plans were false, or were not the real reason for those actions.

Plaintiff also contends that she was discriminated against on the basis of age in the award of raises and promotions. In regard to raises, plaintiff received one raise of $5,000 in 2001, which brought her salary as a senior recruiter up to $60,000. Plaintiff's Dep., pp. 77-78. However, in 2002 or 2003, the top of the salary range for that position was adjusted downward to $45,000 to reflect the market value range. Plaintiff's Dep., p. 78. Thus, plaintiff was not eligible for any further merit raises, since her salary already exceeded the top of the new range. Anderson Aff., ¶ 19. Plaintiff stated in her deposition that as of 2002, Cyndi Williams was earning $70,000 as a senior recruiter, and that Anderson was earning $75,000 as either a senior recruiter or a recruiting specialist. Plaintiff's Dep., p. 83. However, these facts in isolation, without more information as to the work history

25

of these employees, do not show that younger workers received more raises. Plaintiff has produced no evidence that the salaries and raises of younger workers were not limited by the otherwise applicable wage ranges. Plaintiff has not shown that she could establish a prima facie case of discrimination in the matter of raises.

In regard to her promotion claim, plaintiff testified that she applied for one recruiting specialist position, but there is no evidence that a substantially younger person was awarded that position, or that the person who was awarded the position had qualifications similar to plaintiff's qualifications. A prima facie case of discrimination in promotion typically requires a showing that the employee applied for, and was denied, a promotion, and that the promotion was awarded to a person outside the protected class, or in this case, a substantially younger person. As to this position, plaintiff has not shown that she could establish a prima facie case of discrimination. She also testified that she asked to be promoted to recruiting specialist when Rocky Parker was her supervisor, but she also stated that she had no reason to believe that Parker did not promote her because of her age. Plaintiff's Dep., pp. 85, 91.

There is testimony that at Nationwide, it was not always necessary to apply for a promotion in order to receive one. Anderson testified in his deposition that managers looked to their staff to see who performed in a consistent and timely manner, received the strongest feedback from customers, and most strongly demonstrated the Nationwide values of being customer focused, being respectful, and "having a passion for results, a bias for action."

26

Anderson Dep., p. 130.  Anderson stated that when a promotion was
"a progress in the current role as a matter of reward and the job
responsibilities weren't going to change, it was not necessary to
post if they're reporting to the same person or if they're
retaining the same relationship." Anderson Dep., p. 128.  Thus,
the court will also apply a disparate treatment analysis which does
not require that plaintiff show an application for a specific
posted position.

Plaintiff notes that Beth Freiling was promoted to the
position of recruiting specialist.  However, it is not clear from
the evidence whether that promotion occurred before or after
plaintiff had left Nationwide, or whether her supervisor at the
time was Anderson or Hatfield.  Freiling testified that her
promotion was two to three years prior to her deposition on
November 8, 2006, and that her supervisor was either Anderson or
Hatfield.  Freiling Dep., p. 9.  Anderson did not recall if he was
Freiling's supervisor at the time of her promotion.  Anderson Dep.,
p. 128.  There is also no evidence to show that Freiling and
plaintiff had similar qualifications at the time.  Anderson stated
that while Freiling had some "one-off" complaints from customers,
he did not receive any significant or consistent complaints about
her performance.  Anderson Dep., p. 131.  In contrast, he did
receive multiple and consistent complaints about plaintiff's
performance.  Thus, the evidence concerning Freiling's promotion is
insufficient to show disparate treatment.

Plaintiff also noted that Annie Howard was promoted to the
position of senior recruiter.  However, Howard was about the same
age as plaintiff, and evidence that other persons were promoted to

positions other than a position sought by plaintiff is insufficient to satisfy the prima facie test.  Mehr v. Starwood Hotels & Resorts Worldwide, Inc., 72 Fed.Appx. 276 (6th Cir. 2003).

Plaintiff also alleges that younger workers who socialized with management were more likely to be promoted.  However, cronyism does not necessarily constitute illegal discrimination.  See, e.g., Foster v. Dalton, 71 F.3d 52, 56 (1st Cir. 1995)(Title VII does not outlaw cronyism, and cronyism can constitute a nondiscriminatory explanation for an employment action); Betkerur v.Aultman Hosp. Ass'n, 78 F.3d 1079, 1096 (6th Cir. 1996)(allegations of nepotism, even if proven, would not constitute evidence of impermissible discrimination under Title VII or §1981); Maryland Troopers Ass'n, Inc. v. Evans, 993 F.2d 1072, 1077 (4th Cir. 1993)(evidence of cronyism, apart from any racial animus, not racial discrimination).

There is also no relevant evidence to support the allegation that socialization with management improved an employee's chances for promotion to the disadvantage of older employees.  Maroni's report indicated that while one of the four recruiters interviewed felt that socializing with management increased the chances of promotion, the other three did not, and management denied that socializing was a factor in promotion.  The subjective opinions of one employee are insufficient to prove this point.  Anderson also testified that after he was promoted to a supervisory position, he rarely went out for drinks with co-workers because he believed that he should try to "distance yourself from those relationships" as a manager.  Anderson Dep. p. 125.  Plaintiff has not produced any evidence that socializing with Anderson was a factor in any promotion decisions made by him.

There were organized departmental social events as well as spontaneous events after work. Anderson Dep., pp. 124-125. There is no evidence that older employees were ever excluded from these functions. According to Anderson, older employees such as Don Adams and Annie Howard occasionally participated in the after-work drinking groups, and he disagreed that older workers such as plaintiff, Adams and Howard were excluded from participation in these gatherings. Anderson Dep., pp. 124-126. There is no evidence that plaintiff was ever told that she was not welcome to join in after-work socializing. There is no evidence that older employees were denied the opportunity to join in these social events for discriminatory reasons or because of their age, or that their chances of promotion were thereby reduced.

Plaintiff notes the information in Maroni's report that two of the four employees interviewed felt that age may be a factor in promotions, and that one of these employees recently transferred out of Recruiting and Staffing for that reason. This evidence amounts to no more than subjective beliefs or opinions, and it is insufficient to support a finding of discrimination. Hartsel, 87 F.3d at 801-02.

Plaintiff has failed to show that she could present evidence sufficient to establish a prima facie case of discrimination in regard to Nationwide's failure to promote her. There is no evidence that similarly situated younger workers were treated more favorably in regard to promotion.

In addition, Nationwide has offered legitimate, nondiscriminatory reasons for the failure to promote plaintiff to the position of recruiting specialist. For a period of nine months

29

starting in the fall of 2003, plaintiff had performance problems, while other recruiters working under Anderson did not have comparable problems. Plaintiff was not eligible for a promotion or pay raise while she was working under a performance improvement plan. Plaintiff has failed to present evidence sufficient to raise a genuine issue of materia fact on the question of pretext.

Nationwide is entitled to summary judgment on plaintiff's age discrimination claims.

III. Retaliation Claims

Plaintiff has asserted claims of retaliation under the ADEA, 29 U.S.C. §623(d), and Ohio Rev. Code §4112.02(I). Section 623(d) prohibits retaliation against an individual who has opposed any discriminatory practice made unlawful under the ADEA, or who has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or litigation under the ADEA. Section 4112.02(I) makes it unlawful for any person to discriminate in any manner against any person because that person has opposed any discriminatory practice made unlawful under §4112.02 or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under Ohio Rev. Code §§4112.01 to 4112.07. The decisions regarding plaintiff's employment at issue in this case were made on or before June 1, 2004, and there is no evidence that plaintiff filed a formal or informal charge of discrimination prior to December 13, 2004. Therefore, plaintiff's retaliation claim must be based on her "opposition to" discrimination.

In the absence of direct evidence, retaliation claims are governed by the <u>McDonnell Douglas</u> burden-shifting framework.

<u>Weigel v. Baptist Hosp. of East Tennessee</u>, 302 F.3d 367, 381 (6th Cir. 2002); <u>Peterson v. Buckeye Steel Casings</u>, 133 Ohio App.3d 715, 727, 729 N.E.2d 813 (1999)(Ohio courts rely on federal case law when analyzing retaliation claims). To establish a prima facie case of retaliation, plaintiff must show: (1) that she engaged in a protected activity; (2) that the defendant had knowledge of plaintiff's protected activity; (3) that the defendant took an adverse employment action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. <u>Weigel</u>, 302 F.3d at 381; <u>Peterson</u>, 133 Ohio App.3d at 727.

The burden of establishing a prima facie case in a retaliation action "is not onerous, but one easily met." <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 563 (6th Cir. 2000). To show causation, plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct. <u>Id.</u>; <u>Zanders v. Nat'l RR. Passenger Corp.</u>, 898 F.2d 1127, 1135 (6th Cir. 1990)(evidence of causation must be sufficient to raise the inference that the plaintiff's protected activity was the likely reason for the adverse action).

A causal link may be shown through knowledge combined with closeness of time, and by evidence that plaintiff was treated differently from other employees. <u>Johnson v. University of Cincinnati</u>, 215 F.3d 561, 582 (6th Cir. 2000); <u>Moore v. KUKA Welding Sys. & Robot Corp.</u>, 171 F.3d 1073, 1080 (6th Cir. 1999); <u>Neal v. Hamilton County</u>, 87 Ohio App.3d 670, 678, 622 N.E.2d 1130 (1993)(to establish a causal link through temporal proximity, plaintiff must

show that defendant knew of her participation in protected activity, and that alleged retaliatory action followed the protected activity sufficiently close in time to warrant an inference of retaliatory motivation).

However, temporal proximity, standing alone, is insufficient to establish a causal connection. Little v. BP Exploration & Oil Co., 265 F.3d 357, 363-64 (6th Cir. 2001); Nguyen, 229 F.3d at 566; Boggs v. The Scotts Co., No. 04AP-425 (10th Dist. unreported), 2005 WL 647560 at *8 (Ohio App. March 22, 2005). Plaintiff cannot prevail if the employer's treatment of her was the same before and after the protected activity, see Workman v. Frito-Lay, Inc., 165 F.3d 460, 470 (6th Cir. 1999); Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986); or where the evidence shows that the employer would have made the same decision regardless of plaintiff's participation in the protected activity. See McElroy v. Philips Medical Systems North America, Inc., 127 Fed.Appx. 161 (6th Cir. 2005)(no causation where plaintiff's discharge was contemplated and set in motion prior to the filing of his discrimination complaint); Neal, 87 Ohio App.3d at 678.

If plaintiff meets the initial burden of establishing a prima facie case, the burden of production then shifts to the employer to provide a legitimate, non-discriminatory reason for its conduct. Tuttle v. Metropolitan Govt. of Nashville, 474 F.3d 307, 320 (6th Cir. 2007); Peterson, 133 Ohio App.3d at 727. The plaintiff must then demonstrate that the proffered reason was a pretext for retaliatory actions. Tuttle, 474 F.3d at 320; Peterson, 133 Ohio App.3d at 727.

Nationwide argues that plaintiff's complaints to the Human

Resources staff and to her co-workers were insufficient to constitute protected activity. However, protected conduct in opposition to discrimination is not limited to the filing of a formal charge or sending a formal letter to the employer. Barber v. CSX Distribution Servs., 68 F.3d 694, 702 (3d Cir. 1995). Protected conduct can range from voicing an informal complaint to a supervisor to the filing of formal charges. Hertz v. Luzenac America, Inc., 370 F.3d 1014, 1015 (10th Cir. 2004). Informal complaints can take the form of complaints to management, critical letters to customers, or expressing support for co-workers who have filed charges. Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990). Complaints to co-workers which are ultimately communicated to management are also protected. Neiderlander v. American Video Glass Co., 80 Fed.Appx. 256, 260-61 (3d Cir. 2003). However, the complaints must specifically refer to some type of illegal discrimination. See Barber, 68 F.3d at 701 (complaints about unfair treatment in general or expressing dissatisfaction with promotion of another person not sufficient); Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1313 (6th Cir. 1989)(vague charge of "ethnocism" in internal letter or memorandum not sufficient).

In this case, there is evidence that plaintiff discussed filing an age discrimination action with other recruiters in her department, and that Annie Howard and Don Adams reported these conversations to Anderson and Linda Howard, and Anderson in turn reported them to Chieffo in Human Resources. There is also evidence that plaintiff spoke with Barb Scott in Human Resources about age discrimination in promotion. Plaintiff also spoke with

General Counsel LeRoy Johnston about age discrimination and retaliation.  There is sufficient evidence that plaintiff engaged in protected activity so as to meet the first prong of the prima facie case.

There is no dispute that plaintiff suffered an adverse job action when she was given the choice between a second performance improvement plan and thirty days to look for another position.  In regard to whether Nationwide's management had knowledge of the protected activity prior to management reaching a decision to implement that action, plaintiff does not dispute that she spoke with Johnston on June 29, 2004, which was long after the meeting on May 26, 2004, when the choice between the second performance improvement plan and a thirty-day job search was presented to plaintiff.

As to when Anderson learned of plaintiff's discussions with her fellow recruiters about filing an age discrimination action, plaintiff refers to Exhibit 9 to Chieffo's deposition, consisting of a note made by Chieffo concerning Anderson's report to her about plaintiff's discussions with other recruiters about filing an action.  However, there is no date on the note, and Chieffo could not state when she wrote the note, only that it was some time after Anderson's meeting with plaintiff about the first performance improvement plan.  Chieffo Dep. pp. 72, 75.  Anderson stated that he did not learn about plaintiff's conversations with the other recruiters until after June 1, 2004.  Anderson Dep., pp. 116-117.  McMenemy stated that Anderson did not tell him about the reports he had received until on or after June 2, 2004.  McMenemy Dep., pp. 69-70.  A jury could not reasonably conclude from this evidence

that Anderson and McMenemy, the supervisors who made the adverse decision, knew about this protected activity prior to making the decision.

The evidence is conflicting as to when plaintiff made complaints of discrimination to the Corporate Human Resources Department. Chieffo stated that plaintiff spoke with Barb Scott, though she did not know when this occurred; she herself never spoke with plaintiff. Chieffo Dep., pp. 48, 50, 54. Plaintiff testified that she did not recall whether she spoke with Chieffo or Scott, but that she spoke with one of them about age discrimination in promotion within days after she completed her first performance improvement plan. Plaintiff's Dep., pp. 94-95. However, she also testified that she went to Human Resources after the meeting on May 26, 2004, but before she gave Anderson her decision on June 1, 2004. Plaintiff's Dep., pp. 142, 149-51. She also testified that she talked with Human Resources around the same period of time she spoke with Johnston, which was on June 29, 2004. Plaintiff's Dep., p. 96. She also stated that she only had one conversation with Chieffo or Scott. Plaintiff's Dep., p. 95. Even assuming that plaintiff spoke with Scott shortly after the completion of her first performance improvement plan in April of 2004, there is no evidence that Anderson or McMenemy, plaintiff's supervisors, knew about any complaints of discrimination made by plaintiff to Human Resources or to anyone else before they decided to place plaintiff on a second performance improvement plan.

It is also questionable whether plaintiff can satisfy the causation element of the prima facie case. Even assuming that protected activity occurred prior to the adverse job action at the

end of May, the temporal proximity of the protected activity alone, without a showing of knowledge on the part of plaintiff's supervisors, is insufficient to establish causation. In addition, even if Anderson and McMenemy were aware of protected activity by plaintiff before they contemplated disciplinary action, their treatment of plaintiff was the same both before and after the protected activity, namely, putting her on a performance improvement plan.

Even assuming that plaintiff has produced sufficient evidence to establish a prima facie case of retaliation, Nationwide has produced evidence of legitimate, nondiscriminatory reasons for the adverse action. After plaintiff's completion of the first performance improvement plan, Anderson received several new complaints concerning plaintiff's performance after plaintiff was removed from the first performance improvement plan, including a survey of hiring managers indicating significant dissatisfaction with plaintiff's performance. In his view, plaintiff's performance was deteriorating, and she was not showing signs of improvement. In light of the accumulation of plaintiff's performance issues, he decided to offer plaintiff a choice between a second performance improvement plan and a thirty-day period in which to seek a new position. Anderson Aff., ¶ 32. Plaintiff has not produced evidence sufficient to raise a genuine issue of fact as to whether these reasons were a pretext for retaliation.

Nationwide is entitled to summary judgment on plaintiff's retaliation claims.

IV. Public Policy Claim

Plaintiff has also asserted a claim for wrongful termination

36

in violation of Ohio's public policy against age discrimination and retaliation.  Nationwide argues that plaintiff cannot pursue this claim because of the extensive remedies provided by Ohio Rev. Code §4112.02.  Nationwide has cited authority in support of its position.  However, after the decision in Livingston v. Hillside Rehab. Hosp., 79 Ohio St.3d 249, 680 N.E.2d 1220 (1997), in which the Ohio Supreme Court summarily upheld the right of the employee to pursue a public policy claim as well as a claim for age discrimination under Ohio Rev. Code §4112.17 (since recodified as Ohio Rev. Code §4112.14), both Ohio and federal courts have concluded that Ohio law recognizes a claim for tortious wrongful termination in violation of public policy based on age discrimination.  See, e.g., Ziegler v. IBP Hog Market, Inc., 249 F.3d 509, 519 (6th Cir. 2001); Ferraro v. B.F.Goodrich Co., 149 Ohio App.3d 301, 315-16, 777 N.E.2d 282 (2002).  In Leininger v. Pioneer National Latex, No. 05-COA-048 (5th App. Dist. unreported), 2006 WL 1461239 (Ohio App. May 26), appeal allowed, 111 Ohio St.3d 1430, 855 N.E.2d 496 (2006), the court held that Ohio law permits a public policy claim based on age discrimination.  That case is currently pending before the Ohio Supreme Court.  Thus, this court will address plaintiff's public policy claim.

To prove wrongful discharge in violation of public policy, a plaintiff must prove: (1) that a clear public policy existed and was manifested in a state or federal constitution, in a statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); 93) that the plaintiff's

dismissal was motivated by conduct related to the public policy (the causation element); and (4) that the employer lacked an overriding legitimate business justification for the dismissal (the overriding-justification element). <u>Collins v. Rizkana</u>, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653 (1995); <u>Abrams v. American Computer Technology</u>, 168 Ohio App.3d 362, 860 N.E.2d 123 (2006). The clarity and jeopardy elements pose questions of law to be determined by the court, while the causation and overriding-justification elements are questions of fact. <u>Kulch v. Structural Fibers, Inc.</u>, 78 Ohio St.3d 134, 151, 677 N.E.2d 308 (1997).

Public policy claims necessarily fail where the underlying statutory discrimination claims fail. <u>Hausler v. General Electric Co.</u>, 134 Fed.Appx. 890 (6th Cir. 2005)(plaintiff's public policy claim properly dismissed where plaintiff was unable to withstand summary judgment on the issue of whether the employer's stated justification for dismissal was pretextual); <u>Godfredson v. Hess & Clark, Inc.</u>, 173 F.3d 365, 375 (6th Cir. 1999)(plaintiff's claim of discrimination in violation of Ohio public policy failed where plaintiff could not show that the employer's stated justification for dismissal was pretextual). Since plaintiff has not produced evidence sufficient to raise a genuine issue of material fact as to whether the reasons for the termination of her employment offered by defendant were false or a pretext for age discrimination or retaliation, her public policy claim fails as well.

<u>V. Conclusion</u>

In accordance with the foregoing, the motion for summary judgment of defendant Nationwide is granted, and the clerk shall enter judgment in favor of the defendant. Costs shall be awarded

against the plaintiff.

     It is so ordered.

Date: March 26, 2007            _____s\James L. Graham_____
                                      James L. Graham
                                      United States District Judge